Filed 06/18/24  In re J.S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.S. et al., Persons Coming Under the Juvenile Court Law. | C099315 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY, AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>V.S.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD240787, JD240788, & JD240789) |

Father of the minors appeals from the juvenile court's order terminating parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 395; undesignated section references are to the Welfare and Institutions Code.)  He contends the juvenile court erred in failing to find the beneficial parental relationship exception to adoption applied.  We disagree and affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

In August 2020, the Sacramento County Department of Child, Family and Adult Services (Department) filed section 300 petitions on behalf of minors Je. (then age 10), Js. (then age 7) and Jd. (then age 6), based on mother's substance abuse and mental health issues and father's failure to protect. There were additional safety concerns as all three minors had autism spectrum disorder that diminished their awareness of dangers. The minors were ordered detained.

The combined jurisdiction/disposition hearing took place in November 2020. The minors were placed together. Je. was the only minor able to communicate. He appeared comfortable in the caretaker's home and said he felt safe there. Js. and Jd. were primarily nonverbal due to their severe autism. Js. was active, alert, and happy, with a tendency to twist his hair. Jd. was very loving and affectionate and attempted to communicate with the social worker by pointing. The juvenile court sustained the section 300 petitions, adjudged the minors dependent children of the court, and ordered reunification services for the parents.

Mother was diagnosed in April 2021 with stage four lung cancer and admitted to hospice that month. Both parents struggled with mother's diagnosis. The minors were receiving services through Alta Regional Services. Their caregiver had created a routine that helped the minors thrive. Jd. was calm but could become withdrawn and benefitted from being with his siblings. Js. was usually calm, but he became aggressive upon seeing people with electronic devices. Je. was sociable, articulate, inquisitive, and craved routine and stability. He was parentified and hypervigilant. The caregiver was working with him to build coping skills.

Father's mental health assessment clinician noted father did not understand how instability impacts the minors. Father completed three individual counseling sessions, but counseling was put on hold following the mother's cancer diagnosis, as father declined to participate while addressing mother's health issues.

2

Parents had two-hour supervised/observed visits twice a week. Js. and Jd. had positive reactions to visits with parents, but Je. tended to worry about the visits. The caregiver had prepared the minors to visit mother in the hospital (as she had nasal cannulas and was hooked up to monitors) and the minors were excited to see her. Father, however, became upset when Je. kept asking his caregiver to assist him, and yelled, " 'She's not your mom, she's not your mom.' " Je. was especially affected by father's words, repeating them after a bus driver referred to the caregiver as "mom," and again after he had a nightmare when Je. suggested he could seek comfort from the caregiver. Father refused to reach out to the therapist about ways to address mother's diagnosis with the minors and maintained that he had addressed the situation.

Mother died on May 6, 2021. Reunification services for father were continued at the following May 2021 review hearing.

In July 2021, the social worker reported father was participating in a hybrid form of visitation. He and the minors were participating in an Applied Behavior Analysis Building Blocks program together for four-hour sessions, twice a week. Father was eager to learn and participated as directed. The social worker was working to provide additional services to improve father's communication skills with the minors. Father and the minors were continuing to grieve mother's death. Father was participating in grief and loss services, but the social worker was concerned that, while father's intentions were good, his inability to self-regulate caused him to lash out at the minors.

In August 2021, it was reported that all three minors were in school and participating in specialized services. They continued to appear comfortable in the presence of the caregiver. The caregiver provided a highly structured home. Father was continuing to participate in counseling. Father's visits were supervised and had recently required increasing to two supervisors during the visits, as father was not doing much parenting during the visits. Additionally, the minors were having "very erratic behaviors" during the visits. Father acknowledged that he has a difficult time addressing behaviors

3

or interacting with Je. The juvenile court continued father's reunification services at the September 2021 review hearing.

Around the September review hearing, father was diagnosed with prostate cancer. He began treatment in January 2022, and the side effects were nearly unbearable. He was hospitalized multiple times and was usually in a lot of pain. He completed grief counseling and individual counseling but had been unable to focus on Alta Regional Center services due to his medical issues and pain. Father continued to participate in twice weekly visits that included applied behavior analysis services with parenting coaching. He had, however, missed visits due to hospitalization, pain, or side effects. These missed visits negatively affected the minors, especially Je., who had become increasingly more agitated. Je. would constantly ask father to bring him gifts, certain foods, or treats. When father could not attend, Je. would act out and/or throw tantrums. Je. began pulling out his hair when upset. Father had been counseled about not making promises to be at the visits. In February 2022, it was reported Je. was progressing but still struggling with anxiety and tantrums and he had been diagnosed with trichotillomania due to his hair pulling.

After the contested 18-month review hearing concluding in March 2022, the juvenile court found additional specialized services needed to be provided to father and continued reunification services.

The Department recommended reunification services be terminated at the November 2022 review hearing. Father's health, pain, and hospitalizations had caused missed visits and delays in father's progress. On August 25, 2022, the father had been admitted to the Intensive Care Unit (ICU) at UC Davis Hospital.

The minors continued to receive services for their behavioral issues and mental health. Je. was reported to believe he was a "bad kid" and responsible for mother's death. Je.'s therapist stated that Je. was struggling with understanding father's illness because Je. was being told different things by the caregiver and by father. The therapist stated

4

that Je. would benefit from father providing him with more realistic answers, rather than telling him that everything was okay. Je. would return to the foster home after visits and have meltdowns that would last hours. Je.'s therapist had coached father how to answer Je.'s questions, but father continued to tell Je. that he (father) was okay. Je. would hang onto father's words so when father would tell him that he would be at the next visit, Je. would expect him. If father was too sick or in the hospital, Je. would have a meltdown. Je.'s therapist stated that it was crucial that father have honest conversations.

Father was still scheduled to visit twice a week but could not be consistent due to his medical issues. One of the two days was reserved for park visits. Father would engage and play with the minors but become winded and struggle to gain control over Jd.

Je.'s therapist noted that Je.'s progress in his trauma-focused cognitive behavioral therapy had been complicated by father's health issues. Je. "expressed consistent distress and anxiety related to his father's health and inconsistency in visitation attendance." Attempts were made to provide father with education regarding trauma and autism, but father had been unable to participate consistently due to the decline in father's health. Jd. was reassessed for mental health services in September 2022. Due to Jd.'s continued difficult behaviors in visits and with his siblings, it was recommended father and the caregiver alternate weeks and participate in ongoing services to manage Jd.'s difficult behaviors.

In November 2022, the juvenile court found father's progress in services had been "fair," terminated father's reunification services, and set a section 366.26 selection and implementation hearing.

The section 366.26 hearing did not take place until August 2023. By the time of the hearing, Je. was 13 years old, Js. was 10 years old, and Jd. was 9 years old. In February 2023, it was reported father had been participating in observed visits once a week for 90 minutes each. He would hug and play with the minors, engage with them, and take care of their physical needs, but he would struggle with following through with

5

set expectations and engaging the minors without the bribe of food or technology. In August 2023, it was reported that father had been visiting the minors once a month for 90 minutes each visit. He consistently visited except when he was unable due to his own medical issues. The visits were supervised. He brought snacks and toys and engaged with the minors, although he required support with redirecting the minors when they would have tantrums or not listen. The minors appeared happy to go to visits but did not appear sad to leave visits or have any issues when it was time to end the visits. The minors would hug father when prompted. Father would tell the minors he missed them, but the minors would not respond.

Neither Jd. nor Js. displayed any behavioral issues after visits, but Je. did. Je. would become more defiant and argumentative and be reluctant to listen to directions for days following father's visits. He would also be more aggressive with Jd. Je.'s behaviors had improved since visits with father were reduced from twice a week to once a month. The minors did not ask about father between visits, even after the reduction in visits.

The minors remained placed together in the home where they had been living since September 2020. The minors had shown a lot of growth since placement, and the caregiver met their emotional, physical, developmental, and educational needs. The minors appeared happy in the home and sought out the caregiver when they needed something. They would often walk up and voluntarily hug the caregiver or try to sit on her lap. The caregiver expressed her deep commitment to adopting all three minors and had been screened and cleared.

The social worker reported in February 2023 that because Jd. and Js. have limited communication skills, she had been unable to get statements from them as to how they feel about adoption. Je. told the social worker that if father learned to feed him and his brothers the way the caregiver does, then he would like to live with father. If he cannot live with father, he wanted to stay with the caregiver. At the August 2023 hearing, minors' counsel indicated that Je. said he wanted the court to put him up for adoption.

6

Je.'s therapist stated the caregiver has been a source of support for Je. and she makes him feel safe. The predictability and consistency of the caregiver has been important to Je.'s overall sense of safety and that disruption in Je.'s placement with the caregiver and his siblings would be detrimental to his psychological functioning.

At the conclusion of the hearing, the juvenile court found that father had consistently visited the minors but had failed to establish the minors had the type of bond to him that would support the beneficial parental relationship exception to adoption. Specifically, the juvenile court believed the minors had a connection to father, but father had not established the connection was a substantial positive emotional attachment of the kind that would benefit the minors to continue. Accordingly, the juvenile court found the beneficial parental relationship exception to adoption did not apply and terminated parental rights.

Father appeals. This matter was fully briefed on March 11, 2024.

DISCUSSION

Father contends the juvenile court erred by failing to apply the beneficial parental relationship exception to adoption. We disagree.

At the selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the so-called beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).)

7

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to the termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

As to the first element, the juvenile court found that father maintained consistent visitation with the minors.

As to the second element, the juvenile court found that father had not established the connection to the minors was a substantial positive emotional attachment of the kind that would benefit the minors to continue. Father offered no evidence to meet his burden of establishing that Jd. or Js. have a substantial, positive, emotional attachment to him. (Cf. *Caden C., supra*, 11 Cal.5th at pp. 636-637.) At most, father had generally pleasant

8

visits with Jd. and Js., and that is insufficient to establish the exception to adoption. It is not enough for a parent to show frequent and loving contact during pleasant visits. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) And while the minors appeared happy to go to visits, they exhibited behavior problems during visits that father could not manage, did not respond to father's verbal affection, and did not hug father unless prompted. Although Je. asked about father's whereabouts in the months after his initial removal, neither he nor the other minors would ask about father between visits over the remainder of the three years this case continued. The minors did not ask for more frequent or longer visits, did not have any difficulty leaving father at the end of visits, and did not have any negative reaction to the reduction in the visitation schedule over the last seven or more months preceding the section 366.26 hearing. In fact, Je.'s behaviors *improved* after visits with father were reduced. Father's refusal to provide Je. with honest answers about his health or whether he would actually be able to attend visits was a source of anxiety and uncertainty, not security or stability. By the time of the section 366.26 hearing, 13-year-old Je. was requesting he be freed for adoption.

In sum, substantial evidence supports the juvenile court's finding that father failed to establish the minors have a substantial, positive, emotional attachment to him — the kind of attachment implying that the minors would benefit from continuing the relationship. (*Caden C., supra*, 11 Cal.5th at p. 636.) Since the father failed to meet his burden to prove a positive relationship that would be a benefit to continue, the juvenile court properly declined to apply the beneficial parental relationship exception.

9

DISPOSITION

The juvenile court's order terminating parental rights is affirmed.


                                        /s/
                                        MESIWALA, J.



We concur:



 /s/
MAURO, Acting P. J.



 /s/
FEINBERG, J.